Filed 2/24/21  In re V.B. CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
## SECOND APPELLATE DISTRICT
## DIVISION TWO

| | |
|---|---|
| In re V.B., a Person Coming Under the Juvenile Court Law. | B306517 |
| | (Los Angeles County Super. Ct. No. 19CCJP07730A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. B.Y., Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Martha A. Matthews.  Affirmed.

Jacob I. Olson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, Acting County Counsel, Sarah Vesecky, Senior Deputy County Counsel for Plaintiff and Respondent.

Appellant Brittany Y. (mother) appeals from orders establishing dependency jurisdiction over her daughter Violet (born 2013) and removing the child from her custody. Mother contends there was insufficient evidence to support the juvenile court's jurisdictional findings under Welfare and Institutions Code section 300, subdivision (b)[1] that her mental and emotional problems endangered Violet's physical health and safety and placed the child at risk of harm.

While this appeal was pending, the juvenile court returned Violet to mother's custody.[2] We therefore grant the Department's request for partial dismissal of mother's appeal challenging the dispositional order removing Violet from her custody. We affirm the juvenile court's jurisdictional orders.

## BACKGROUND

**Detention and section 300 petition**

The Los Angeles County Department of Children and Family Services (the Department) received a referral in October 2019 alleging general neglect of Violet by mother. The caller reported that mother was currently in a manic episode and was threatening suicide. The caller stated that Violet's father, who lived in Pennsylvania, was worried about the child's safety.

A Department social worker made an unannounced visit at mother's home on October 17, 2019. When mother declined permission to enter the home, the social worker left but returned

---

[1] All further statutory references are to the Welfare and Institutions Code.

[2] We grant the Department's request for judicial notice of the juvenile court's January 4, 2021 order returning Violet to mother's custody.

2

later with a member of the Los Angeles County Department of Mental Health's Psychiatric Mobile Response Team (PMRT).[3] Mother continued to deny access to the home for an assessment of any kind but said she was willing to discuss the allegations.

Mother denied the allegations of neglect. She also denied having any significant mental health issues. Mother said she receives messages from and "channels" dead people, including a deceased rapper named "Mac Miller" and posts the messages on social media. Mother said Violet also "channels."

Mother denied suicidal ideation or wanting to harm others. She said the voices she hears have never told her to hurt Violet. Mother stated: "I don't see dead people. I see energy. Everyone should be talking to God. In my channeling I felt the experiences of death from friends that passed away. I got off Adderall because I felt it was killing me. Whenever I got off Adderall everyone told me I was going crazy. People should pay attention to how they respond to someone in pain. They don't understand the severity. I'm on the outside of the living because I have things to do. Sometimes it feels like my brain is swelling. In 2016 I had a fall and then there was pain." Mother explained that she suffered an illness that caused her to lose consciousness, fall, and injure her head. Mother said her illness was caused by exposure to black mold.

Mother claimed that when she and Violet first moved to California, they stayed in a motel, and mother stabbed an

---

[3]     PMRTs consist of Department of Mental Health clinicians who perform evaluations for involuntary detention of individuals who present at risk of harm to themselves or others, or who are unable to provide food, clothing, or shelter for themselves. (https://dmh.lacounty.gov/our-services/countywide-services/eob/)

3

intruder who entered their motel room.  She further stated that her relationship with the maternal uncle, who lived in the home with them, was strained.

The social worker observed that mother was having difficulty maintaining a consistent train of thought.  The PMRT member assessed mother as being in active psychosis but determined that mother did not meet the criteria for involuntary hospitalization.

At the social worker's request, mother attended an intake appointment at Edelman's Mental Outpatient Clinic for Mental Health for Adults on October 24, 2019.  She had a follow up appointment with a therapist and a psychiatrist in early November.

The social worker met with Violet at the child's school on October 23, 2019.  Violet reported that she lived with mother, the maternal grandmother, a maternal uncle, and a family friend.  She said she was not in contact with her father.  Violet denied any abuse.  She said mother prepared her food, gave her baths, and helped her dress.  Violet reported sometimes being afraid of mother:  "My mom sometimes makes me scared with the voice that makes me scared.  She uses that voice with [maternal uncle] and it scares me a lot."  Violet explained that mother and the maternal uncle did not get along and argued a lot.  She said the maternal uncle "told me he would hurt me but didn't say how.  He told me he does not like my mom.  He told me to die.  My Mom told me he said that."

The maternal grandmother told the social worker that mother previously lived in Pennsylvania and had seen therapists and undergone psychological examinations there, but her condition worsened when she was prescribed Adderall.  After

4

being exposed to mold and a fall resulting in a head injury, mother began having disorganized thoughts and was unable to function normally.  The maternal grandmother said she believed mother would not harm Violet, but the child was never left alone in mother's care.  She said mother needed services but she did not know where to begin.

The Department received another referral on October 28, 2019.  The caller reported that mother attended a neighborhood party and brought the neighbor a bag filled with papers.  The papers included a receipt from a marijuana dispensary, and pages ripped from books, overwritten with mother's handwritten notes.  The handwritten notes referred to a child's penis, the neighbor's husband, and various nonsensical statements.  Mother told the caller that law enforcement had responded to her home because she had posted online messages indicating she intended to harm herself.  Mother said she was not referring to herself, but to other people.  The caller reported that mother did not appear to be doing well mentally.

The Department received another referral on October 31, 2019, reporting that mother had been making disturbing social media posts about dead people.  The caller claimed that the fall resulting in mother's head injury was not caused by her exposure to mold but was the result of mother's drug use, including Adderall, alcohol, and marijuana.

The social worker met with mother to discuss the referral generated as the result of mother's social media posts.  Mother insisted she would continue to post online to "solicit for her business as a clairvoyant to speak to dead people."  She agreed to submit to a drug test.

On November 2, 2019, the social worker informed mother that she had tested positive for marijuana. Mother said she used marijuana to treat her condition resulting from black mold exposure. Mother did not attend her psychiatric follow up appointment and had not called to reschedule the appointment.

At the December 4, 2019 detention hearing, the juvenile court found a prima facie case for detaining Violet from mother. The court ordered monitored visits for mother at least three times per week for at least three hours per visit.

On January 14, 2020, the Department filed a first amended petition that alleged, under section 300, subdivision (b), that mother's mental and emotional problems, her failure to participate in mental health treatment, and mother's history of substance abuse and current abuse of marijuana and Adderall placed Violet at risk of harm. The petition further alleged that mother placed Violet in a detrimental and endangering situation by allowing the maternal uncle, who threatened to hurt mother and the child, to reside in the family home and have unlimited access to the child. As to Violet's father, the petition alleged that his criminal and substance abuse history placed the child at risk of harm and that he failed to protect Violet from mother's substance abuse and mental and emotional problems.

**Jurisdiction and disposition**

In a January 10, 2020 interview, mother told the dependency investigator that she was diagnosed with ADD at age 20, was prescribed medication, and took the medication for a period of time before discontinuing it. Mother said she fell and hurt her neck in 2016. She thereafter moved in with the maternal grandmother, and father had cared for Violet for months at a time. Father was subsequently arrested and mother

6

resumed caring for Violet.  Mother and Violet moved to California when she became concerned that father was using drugs.

Mother said she and Violet lived in a motel for three weeks when they first moved to California because they had no place to live.  Mother denied telling the social worker that she had stabbed an intruder at the motel.  She reported that what had actually occurred was that "someone busted the door open and they fell to the ground.  I got out the butcher knife that I cut fruit with and I stood over them and screamed for them to get out.  He begged for his life and left.  The police then arrived and said they would canvas the area."

Mother said that her social media posts were her means of coping with the deaths of people who had been close to her.  She realized now that her posts were inappropriate.  Mother said that during a FaceTime visit with a friend, both mother and Violet saw an orb hovering around the friend's head.  She denied being hallucinatory and stated:  "As far as paranoia and hallucinations, I think there is a bi[g] difference between what is your imagination and defining paranoia and hallucinations.  The main thing is the orb, it's not a hallucination if it's on a picture.  I use my imagination to help my daughter make sense of it. . . ."

Mother said she smoked marijuana three times a week to manage her neck pain.  She was awaiting an MRI for a suspected pinched nerve.  Mother said she sometimes left Violet in the bedroom and smoked marijuana in the backyard.  Mother tested positive for marijuana on December 20, 2019, had a negative, but dilute test on December 26, and failed to appear for testing on December 24 and 31, 2019.

Mother admitted to being hospitalized involuntarily in 2018 after she became upset and angry during an argument with

her grandparents. She attributed the outburst to her withdrawal from Adderall. Mother further disclosed she was hospitalized in 2012 after attempting to take a bottle of sleeping pills.

Mother said she argues occasionally with the maternal uncle but that they generally get along. During one argument overheard by Violet, the maternal uncle told mother she would be better off dead. Mother denied that the maternal uncle had threatened Violet. She said the maternal uncle was willing to relocate if doing so would facilitate Violet's return.

Mother said Violet's father was a long-time marijuana user and that she suspected he sold drugs as well. She reported that father moved to Colorado when Violet was a year old.

Father, Richard B., was incarcerated and spoke with the dependency investigator by telephone on January 10, 2020. Father reported he wanted temporary custody of Violet. He said he had cared for Violet alone on a full-time basis when the child was three or four years old because mother "just dropped her face off the world." He said mother subsequently took Violet to California without his knowledge.

Father said he and mother separated two months after Violet's birth but that he continued to see the child two to three times a week. He stated that mother "was starting to get crazy when Violet was born, but not nearly on the level as she is now." Father reported that mother "would come to my house because she had nowhere to go. She would be banging on my door, Violet would come out to see, and mother would say 'do you want mommy to go kill herself' those exact wor[d]s."

Father admitted using marijuana in the past but denied doing so currently and denied any other drug use. He said he was incarcerated in 2019 for forgery and counterfeiting.

8

The dependency investigator also spoke with Cindy Reyes, mother's psychiatric social worker at the Department of Mental Health. Reyes stated that she had been seeing mother for a few weeks and that mother had been diagnosed with schizophrenia and cannabis dependency. She said that mother minimized her condition and was unwilling to take medication. Mother had agreed, however, to a mental health assessment by a psychiatrist. Reyes recommended that mother discontinue using marijuana, as continued use would only exacerbate her symptoms.

In Last Minute Information For the Court filed on January 29, 2020, the Department reported on an interview with Violet at her school. Violet told the social worker that she felt safe with mother, the maternal grandmother, and maternal uncle. She denied being afraid of the maternal uncle.

Violet said she and her family were from Pittsburg and that she had lived most of the time there with father. She often visited the paternal grandmother and her cousins. Violet said mother took her away from father's care after Violet informed mother about father's drug use. Mother and Violet then moved into their own apartment, where mother became ill as the result of mold exposure. Mother and Violet thereafter moved to California.

Mother reported that she had undergone a psychiatric evaluation and had been diagnosed with psychosis. She was prescribed Abilify and attempted to take the medication but discontinued it because it made her tired and nauseated. Mother said she also discontinued the medication because her chiropractor told her the medication would exacerbate a brain swelling condition that might be afflicting mother. The

9

dependency investigator attempted unsuccessfully to contact mother's chiropractor.

Father remained incarcerated in January 2020. The paternal grandmother informed the dependency investigator that father was scheduled to be released on January 28, 2020.

The juvenile court twice continued the adjudication hearing, first to March 2020, and then to June 2020. The court ordered the Department to provide updated information on father, including a home assessment, a background check, and a recommendation as to whether Violet could be released to father or to other paternal relatives.

In a Last Minute Information for the Court dated June 24, 2020, the Department reported that father was again incarcerated in April. His release date was not known.

The paternal grandmother expressed interest in caring for Violet. She said she had cared for Violet in the past, had a strong connection with the child, and continued to have contact with her on a daily basis.

Between January 2020 and May 2020, mother tested positive for marijuana six times, most recently on May 27, 2020; failed to appear for testing six times; and tested negative 10 times. The Department obtained mother's mental health assessment from the Department of Mental Health. Dr. Fabian Hernandez had diagnosed mother with schizophrenia, cannabis dependency, and schizoaffective disorder. Dr. Hernandez changed mother's prescribed medication from Abilify to Latuda.

In a second Last Minute Information for the Court, also dated June 24, 2020, the Department reported that mother had completed a two-hour online parenting class. Mother was seeing a new psychiatrist, Dr. Dow, at Didi Hirsch Mental Health

10

Services. According to mother, Dr. Dow had recommended that mother take psychotropic medications for her ADHD but none had been prescribed. Mother was also seeing a therapist at Didi Hirsch Mental Health Services on a weekly basis.

At the June 24, 2020 adjudication hearing, the juvenile court sustained an amended petition stating that mother's mental and emotional problems inhibited her ability to provide constant care and supervision for Violet, placing the child at risk of harm; that father failed to protect Violet from mother's mental and emotional problems; and that father's conduct and his criminal and substance abuse history also placed Violet at risk of harm.[4] The juvenile court declared Violet a dependent child and

---

[4] The sustained allegations state:

"b-1 (First Amended)
The child Violet . . . ['s] mother, Brittany [Y.] has mental and emotional problems, including but not limited to paranoia, hallucinations and auditory hallucinations which render the mother unable to provide regular care for the child. The mother's mental and emotional problems have inhibited the mother's ability to provide constant care and supervision. In October and November 2019, the mother demonstrated delusional and irrational thought processes. Furthermore, the child's father, Richard [B.], failed or was unable to take action to protect the child when he knew, or reasonably should have known, that the mother was suffering from mental and emotional problems. Such mental and emotional problems on the part of the mother, and father's failure to protect, endangers the child's physical health and safety and places the child at risk of serious physical harm, damage and danger."

"(b-4) (First Amended)

11

ordered her removed from parental custody. The court ordered reunification services for both parents. Mother's services were to include mental health counseling, individual counseling, and weekly drug testing. Mother was accorded monitored visits at least three times per week for three hours each visit.

This appeal by mother followed.[5]

## I. Justiciability of mother's appeal

In this appeal, mother challenges the sufficiency of the evidence as to her conduct only -- she makes no challenge to the jurisdictional findings against father. The Department argues that because the issues raised in mother's appeal have no effect on the juvenile court's assumption of dependency jurisdiction, mother's appeal is not justiciable because it will have no practical impact.

A juvenile court need only find that one parent's conduct has created circumstances triggering section 300 in order for the court to assume jurisdiction over the child. (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1491.) "For jurisdictional purposes, it is irrelevant which parent created those circumstances. A jurisdictional finding involving the conduct of a particular parent is not necessary for the court to enter orders binding on that

_____

The child, Violet [B.]'s father, Richard [B.], has a criminal and substance abuse history, including marijuana abuse. Father has several substance abuse related charges including possession of drug and drug [paraphernalia] . . . , and driving while intoxicated . . . . The father's criminal and substance abuse history and conduct endangers the child's physical safety and emotional well being, placing the child at risk of physical and emotional harm and damage."

[5]      Father is not a party to this appeal.

parent, once dependency jurisdiction has been established. [Citation.] As a result, it is commonly said that a jurisdictional finding involving one parent is "'good against both. More accurately, the minor is a dependent if the actions of either parent bring [him] within one of the statutory definitions of a dependent.'" [Citation.] For this reason, an appellate court may decline to address the evidentiary support for any remaining jurisdictional findings once a single finding has been found to be supported by the evidence. [Citations.]" (*Id.* at p. 1492.)

An appellate court may, however, address the merits of the jurisdictional findings against one parent when that finding could be prejudicial to the parent, could potentially impact the current or future dependency proceedings, or could have other consequences for the parent beyond jurisdiction. (*In re Drake M.* (2012) 211 Cal.App.4th 754, 762-763.) We exercise our discretion to do so here and find that substantial evidence supports the juvenile courts' jurisdictional orders.

## II. Jurisdiction

### A. *Applicable law and standard of review*

Section 300, subdivision (b) authorizes the dependency court to assume jurisdiction over a child when the child has suffered or is at a substantial risk of suffering serious physical harm as a result of the parent's failure or inability to adequately supervise or protect the child.

To prevail on the issue of jurisdiction under section 300, subdivision (b)(1) in a case involving a parent's mental illness, the Department bears the burden of proving three elements by a preponderance of the evidence: (1) the parent's inability to provide regular care for the child due to mental illness; (2) causation; and (3) a "substantial risk" of "serious physical

13

harm." (§ 300, subd. (b)(1); *In re I.J.* (2013) 56 Cal.4th 766, 773 (*I.J.*).) A parent's mental illness alone is an insufficient basis for dependency jurisdiction under section 300, subdivision (b)(1). (*In re A.L.* (2017) 18 Cal.App.5th 1044, 1050.)

"Although 'the question under section 300 is whether circumstances *at the time of the hearing* subject the minor to the defined risk of harm' [citation], the court may nevertheless consider past events when determining whether a child presently needs the juvenile court's protection. [Citations.] A parent's past conduct is a good predictor of future behavior." (*In re T.V.* (2013) 217 Cal.App.4th 126, 133.)

"'In reviewing a challenge to the sufficiency of the evidence supporting the [juvenile court's] jurisdictional findings . . . , we determine if substantial evidence, contradicted or uncontradicted, supports them. "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." (*In re Heather A.* (1996) 52 Cal.App.4th 183, 193.) "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court. [Citations.]"'" (*I.J.*, *supra,* 56 Cal.4th at p. 773.)

### B. *Substantial evidence supports the jurisdictional findings*

Substantial evidence supports the juvenile court's jurisdictional findings. The record shows that mother had a history of mental health problems that predated the events leading to the juvenile court's assumption of jurisdiction over

14

Violet. Mother was hospitalized in 2012 after attempting to take a bottle of sleeping pills. She was involuntarily hospitalized in 2018 after an argument with her grandparents.

When Violet was three or four years old, mother surrendered care of the child to father, who was a drug abuser. Mother was at times homeless and visited Violet only sporadically. She sometimes appeared unannounced at father's home and threatened to kill herself.

At the time of the Department's initial intervention, mother was diagnosed as being in active psychosis and had difficulty maintaining a coherent train of thought. She had both visual and auditory hallucinations and claimed that both she and Violet "channeled" dead people. The Department received multiple referrals during the course of the case.

Mother's psychosis sometimes involved violent thoughts. Mother told the investigating social worker that she had stabbed an intruder at the motel where she and Violet lived when they first moved to California. Mother told Violet that the maternal uncle had threatened to harm both her and the child. Some of mother's social media posts indicated she might harm herself or others.

Violet disclosed that she was sometimes afraid of mother. Violet further disclosed that mother had told her the maternal uncle had threatened to harm her.

Although the maternal grandmother did not believe mother would harm Violet, she said Violet was never left alone in mother's care. The maternal grandmother further stated that mother needed services.

Mother was diagnosed with schizophrenia, cannabis dependency, and schizoaffective disorder. She minimized her

15

mental and emotional health issues, however, claiming her problems were caused by a previous exposure to mold.

Although mother's initial treating psychiatrist prescribed psychotropic medication, mother was resistant to taking medication and discontinued doing so. A subsequent psychiatrist also recommended that mother take psychotropic medications, but mother claimed none had been prescribed. She was not taking any medication at the time of the adjudication hearing. Instead, mother self-medicated with marijuana, disregarding recommendations from her therapist that marijuana use would exacerbate her symptoms. Mother admitted being under the influence of marijuana while caring for Violet, who was only seven years old at the time of the adjudication hearing.

The evidence described above is sufficient to support the trial court's finding that Violet was a child described under section 300, subdivision (b). That Violet suffered no actual harm as a result of mother's behavior does not preclude jurisdiction. Proof of current or prior actual harm is unnecessary—a child comes under the statutory definition where there exists a "substantial risk that the child will suffer, serious physical harm or illness" as a result of the parent's inability to care for him. (§ 300, subd. (b)(1).) "'The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child.'" (*I.J., supra,* 56 Cal.4th at p. 773, quoting *In re R.V.* (2012) 208 Cal.App.4th 837, 843.) We do not reweigh the evidence or express any independent judgment thereon—instead, our task is to determine whether there is sufficient evidence to support the findings of the trial court. (*In re Laura F.* (1983) 33 Cal.3d 826, 833.)

16

The juvenile court did not, as mother contends, improperly consider emotional harm to Violet as the basis for assuming jurisdiction over the child.  The record clearly shows the juvenile court's finding that mother's mental and emotional problems placed Violet at risk of serious physical harm.

The record does not support mother's claim that since Violet's detention, "mother has done all that has been asked of her."  Mother did undergo a psychiatric assessment and was seeing both a psychiatrist and a therapist; however, she was not receptive to medication and did not follow the psychiatrists' recommendation that she treat her condition with psychotropic medication.  Mother also disregarded the psychiatrist's recommendation that she discontinue using marijuana, because continued use would exacerbate her symptoms.

Substantial evidence supports the juvenile court's jurisdictional findings under section 300, subdivision (b).

## DISPOSITION

The orders establishing juvenile court jurisdiction over Violet are affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.</u>


_____, J.
CHAVEZ


We concur:


_____, P. J.      _____, J.
LUI                                   ASHMANN-GERST